## 5471.   MITCHELL *v.* THE STATE.

The evidence authorized the verdict, and the trial judge did not abuse his
discretion in refusing a new trial.

DECIDED MARCH 26, 1914.

Indictment for assault with intent to rape; from Fulton su-
perior court—Judge B. H. Hill. January 3, 1914.

*Moore & Moore, Watkins & Lewis,* for plaintiff in error.

*Hugh M. Dorsey, solicitor-general,* contra.

WADE, J. J. T. Mitchell was convicted on the charge of assault
with intent to rape, and made a motion for a new trial, which was
overruled. The sole question presented by the bill of exceptions is
whether the evidence adduced at the trial supports the verdict.

The only point insisted upon in the brief for the plaintiff in
error is that at most the evidence for the State would only estab-
lish a case of simple assault; and he relies on the evidence of the
person assaulted to sustain this view, since the witness stated:
"He did not put his hands on any part of my person, except my
arm. He did not put his hands on my limbs or clothes. He did
nothing else than what I have stated." The case turns upon the in-
tention of the party accused of the assault, and upon whether the
jury could have inferred from all his conduct and all surrounding
circumstances that he intended to commit an assault with intent
to rape, or some other offense.

Fannie May Wood, sworn for the State, testified as follows:
"The facts I am going to tell about took place down the Cascade
road in Fulton county, State of Georgia. That happened on Mon-
day, September 8 of this year, I think. That (indicating) is the
defendant, John T. Mitchell. I am fourteen years of age. We
met at the corner of Cascade and Fairburn road. The Cascade
road comes down that way, and the Adamsville that way. I had
come up the Fairburn road, and he was going out the Cascade road.
We met there at the forks. He walked out on the side of the road.
I didn't think of anything happening. I walked on down, and
just as we got to the creek I started to turn down, and he run and
pushed me, kept pushing me forward into the creek. He run up
and grabbed me, and pushed me into the creek. When he got me
down into the creek I was fighting him all the while, trying to get
away, and he was trying to throw me down into the water. He
threw me down on to my knees, threw me down, and was trying to

hold me down. I was hollering, and he says, 'I ain't going to hurt you.' He didn't do anything to my clothes, he was trying to hold me down. I lost my bonnet in the creek, and my brother went down for the bonnet. I didn't go with him. He asked me, as we were going down the road, had the Camps left there (did the Capps [?] live there). I told him, 'No, sir.' When he had hold of me and I was hollowing, he said that he was not going to hurt me. He didn't say anything else to me then. He did not place his hands on any part of my person except my arm. He did not put his hands on my limbs or clothes. He did nothing else than what I have stated. I don't know what he did when I got loose from him. I was running, trying to get away. This was between a quarter and a half a mile from my home. No other house was near. Ours was the nearest house except a little tent on the other side of the road. Nobody was in sight. There was a man down in the bottoms pulling corn, but he could not hear me. When I got loose I ran to the house as hard as I could. My mamma was the first person I told about it. I couldn't speak at first, when I got to the house, but after awhile I told her. I went to my mother as soon as I got to the house, and made complaint, and told her all about it. There was a tent right close by, over 200 yards, I reckon. He was traveling in that direction. We met there at the Cascade road, and I come on down the Cascade road. He was on the other side of the road from me. This was on Monday, the 10th of September. It was Wednesday following when they brought this man to our house,—two days and a little more. I just glanced at him. I knew him enough to know him. The first thing this man did to me, he pushed me in the creek. The water was about a foot and a half deep, I reckon. It was about knee deep in the place where I was. He tried to put my head under the water, that seemed to be his object. The creek went under the road through a culvert. The water runs through there. He grabbed me from behind, and pushed me forward into the creek. There is a bank there, where the culvert is across the creek, and I was going along on that bank, and he pushed me right down the bank into the creek. There was no place on the bank or there where a person could lie down, or do anything like that between where we were and the water when he caught me. I had never seen this man Mitchell before that Monday, and then I seen him on Wednesday. That was the first time I ever

seen him in my life. I first gave a description of him to mamma. I reckon that man acted like a crazy man very much. I never noticed whether he went away from there running. I was running myself. I don't know which way he left, whether through the woods or fields, or how. I don't remember about his shoes. I don't remember anything about his shirt. A little boy said he had on a blue shirt. I stated all the fellow done was to grab me by the arms, and push me down the bank, directly into the creek, and try to put my head under the water. The man in the field could not see up there in the road from where he was at work. This road was between where I was and this man in the field. The road was up on a bank."

The evidence is undoubtedly sufficient to show an assault of some kind, and the jury believed it was the intention of the defendant to have carnal knowledge of Miss Wood forcibly and against her will; and that the trial judge shared in this belief appears from the fact that he refused a new trial. While, on a trial under an indictment for assault with intent to rape, it must appear that the accused had the intention to have carnal knowledge of the female (*Johnson* v. *State, 63 Ga.* 355), "the intent could be inferred from the actions of the defendant." *Ware* v. *State, 67 Ga.* 349. It appears, from the evidence, that the defendant, a grown man and a complete stranger, met a young girl, fourteen years of age, on the roadside at a place where he would probably be safe from interruption or observation, rushed up behind her, pushed her from the embankment along which the road runs, down the embankment, which hid them from the view of the only person in sight; and that this person was some distance off, and scarcely within hearing. The accused forcibly pushed the girl down the embankment, pushed her down to her knees, threw her down, and, as she fought and struggled and sought to free herself, endeavored to keep her down, and assured her that he was "not going to hurt her."

It is true that the witness in her naive simplicity declares that the defendant did not put his hands on her person except her arm, and never put his hands on her limbs or clothes, and did nothing else but hold her, throw her down on her knees in the water, and try to hold her down, and that he acted "like a crazy man." It does not appear, from her evidence, that she realized, at the time of the assault, what the dastardly intention of the defendant must have been. "To the pure all things are pure." It would, however,

be mere affectation on our part to refuse to see more in the conduct of the defendant than appears to the childlike witness. It is obvious, from the evidence as a whole, that his motive could not have been robbery, as the record fails to disclose that the young girl had anything of which the defendant could deprive her except her life, or that which is more precious than life to a chaste female—her sacred honor. Nor does it appear that the defendant sought merely to do her a violent bodily injury (apart from the gratification of beastly lust), since he had ample opportunity to do so, and made no such effort, but assured her that he was "not going to hurt her." His conduct was not merely sportive and prompted by a spirit of innocent playfulness; his entire behavior was unwarranted, rude, and outrageous. What may have been in the mind of a man capable of attempting an assault of this character on a mere child it is impossible for any normal, decent man to understand, but we may surmise that this defendant in his effort to put this girl in the water, or to press her down in the water, desired to stifle her outcries, overcome her resistance, and render her so helpless that she might passively submit to his embraces, or be unable to effectively repel them. It appears from the evidence that the only person anywhere near was out of sight and hearing, but when this young girl, in her instinctive effort to preserve her virtue, cried out as she fought and struggled, the craven heart of the would-be rapist failed him, and when she broke away from him and ran in the direction of her home, he did not follow, but slunk away and disappeared.

The evidence that the assault was of such a nature as to arouse the instinctive and overwhelming fears of the witness appears from her statement that she ran to her home as hard as she could, as soon as she had got loose from the defendant, and did not even stop to recover her bonnet which she lost in the creek, but flew to her mother for rescue, and told all about the occurrence as soon as she could speak. Doubtless an older woman, even though equally as ignorant of evil as this young girl appears to have been, would have recognized the significance of the defendant's conduct and would have reached the same conclusion in regard to it that the jury did on the trial of the case; and it seems to us enough appears in the artless story of the witness to indicate beyond any reasonable doubt the purpose of the defendant, and that the jury

correctly declared what his intention was in making the assault for which he was convicted. In the case referred to above *(Ware* v. *State),* where the evidence showed facts almost parallel with this case, Justice Speer, in passing upon the question as to whether there was sufficient proof of an intention to commit a rape, said: "The little girl, the subject of this assault, was in a byway on her way to a neighbor's house; the shades of evening were gathering. Suddenly, without notice, the defendant rushes from the woods on the roadside, demands to know her name and business, takes hold of her hand, squeezes it, clasps his arms around her waist, raises her from the ground, and is bearing her to the edge of the woods, threatening her life to paralyze her with fear, and when in her cries and tears she threatens him with her father, he suddenly drops her on the ground and flees. What other motive could he have had? She was unknown to him. She was an unprotected child, about twelve years of age. The fiendish flame of lust alone could impel him to such acts. In seeking the motives of human conduct, the jury need not stop where the proof ceases; inferences and deductions from human conduct are proper to be considered where they flow naturally from the facts proved. And such conduct as this points with reasonable, if not with unerring, certainty to the lawless intent he had in view."

*Judgment affirmed. Roan, J., absent.*